Whenever you're ready, please proceed. Thank you. Good afternoon, Your Honors. May it please the Court, Michael Garrett on behalf of United Talent Agency, LLC. At this time and with the Court's permission, I would like to reserve three minutes for rebuttal. Please watch the clock. Thank you. In addressing the two issues on appeal, I think it's important to start with what is not undisputed. It's undisputed that UTA is a talent agency that represents entertainment clients in connection with their activities in the entertainment industry. And the record here is clear that the professional service that UTA provides to its clients is the procurement and negotiation of their contracts of employment. And that's an excerpt of Record 108 and 792. And that's really the only evidence that is before the Court on the scope of that issue. And it's for which UTA seeks coverage for, did not concern the adequacy of professional services rendered by UTA. Instead, they alleged wrongful acts and breaches of certain duties in connection with the solicitation of clients and agents from a competitor. So I take it your argument is therefore the professional liability exclusion doesn't apply here. That is very much our argument. Okay. If you're right about that, it does seem to me that some of the acts alleged here would seem to fall within 533, would they not? Tortious interference with contractual relationships, for example, is an intentional tort that requires a wrongful, wrongful acts by the tortfeasor. So wouldn't at least the interference and stealing, et cetera, wouldn't they fall within the 533 exclusion? There's a multilayered response to that. First is you'd have to first establish that there is a specific intent to injure element within each claim. It's not just intentional acts. There has to be additionally Well, I mean, to take intentional interference with contractual relations, there is a specific intent there. You have to have a wrongful act, and you have to know you're doing the wrongful act. It's intentional interference. It's not negligent interference. So as to that claim, doesn't that fall within the 533 ambit? With that specific claim, it would fall in within this ambit with respect to indemnity, perhaps, although I'll address the district court's ruling, but not the duty to advance Tell me where this policy gives the insurance company the obligation to defend. It doesn't provide a duty to defend. It provides a duty to advance defense costs. But if it does advance defense costs, and it turns out they don't have to have coverage, you have to reimburse those defense costs, do you not? It can pursuant to the fraud exclusion. Well, that's under the policy. That's under the policy. That's why I'm asking the question. So how does 533 play into that? Let's assume for a moment that there's no indemnification obligation to 533. Do you think there is still an obligation to advance costs and an inability to recover them? Yes, there is still an obligation to advance costs. That's clearly set forth in Downey. If there's a reasonable expectation based on the policy... Well, Downey's dealing with a duty to defend, is it not? Correct. Correct. But here we're dealing with an obligation to advance costs. And I guess I'm trying to figure out what your position is. Your position is they have the obligation to advance costs. And that assuming, as my question does, that they don't have to indemnify you because of 533, they can't get the costs back? Is that your position? Correct. They still have a duty to advance defense costs. Why under that? We all agree they have a duty to advance defense costs. Let me just be very precise with my question. Let's assume they've advanced you a million dollars in defense costs. And now the court says, well, there's no liability under the policy because of 533. Is your position is that they're out that million dollars? Yes, because they have an obligation. There's a reasonable expectation that they would advance defense costs. Section 533 doesn't speak to defense costs. The California Supreme Court in Gray, decisions in B&E and Downey, they all say that providing a defense has nothing... There's no bar in Section 533 to provide a defense for a claim that is otherwise precluded by... No, I understand it. But those are providing a defense. So you're extending that reasoning to providing defense costs. I am very... Explicitly, yes, Your Honor. And that is an argument that Raquel has raised, is that there's a distinction between the duty to advance defense costs and the duty to defend. And there are distinctions in certain circumstances, of course. So this leads you to my last question on this line. The district court read the policy provision and said there's no final judgment and therefore 533 doesn't apply. Let's assume that's incorrect because 533 doesn't have that in it. Are all these issues you're now raising ones that the district court should have to address on remand rather than us in the first instance? No, I think they were argued below and... Well, I know they were argued below, but the judge never ruled on them. Correct, but I think the court here can certainly weigh in. Can? I'm asking, wouldn't it make more sense to let the district court sort all these out in the first instance? I don't think so, Your Honor, because there's no real factual determinations to be made there. It's really a legal question as to whether or not the duty to advance defense costs... So if we think you're wrong on that, you'd rather we rule against you on it now than send it back to the district court? If we think you're wrong on the duty to advance defense costs being separate from Section 533, I think that would be contrary to California court's rulings. See, but you don't get to choose your result and tell us whether or not you want us to remand. I'm trying to figure out what the most appropriate way to handle this case is. And this is an issue that the district court never addressed because I think it made a mistake as to whether 533 was separate from the policy obligations. And so there's a whole series of those issues. You contend, for example, that some of the alleged torts for breach of fiduciary duty aren't covered by 533. So I'm asking, why doesn't it make sense under that circumstance if we think the court erred? It's just sending the whole thing back to the court to deal with all these issues in the first instance. We wouldn't oppose that. I mean, we obviously have to address the professional services exclusion, so presuming that that does not apply. I started by saying, assuming you're right about that. Okay, assuming you're right on the professional services exclusion, then we wouldn't oppose dealing with that before the district court. And then if necessary, having to come back here and address it. I assume either way one of us would be wanting to address it. But I think I would direct the court's attention to the Braden decision that we cited in our brief. It's a northern district California decision, but it walks through all of B&E, Downey, Gray, and basically says that the duty to advance defense costs creates a reasonable expectation of coverage that's separate and apart from the indemnity. And that's what Downey focused on, too, is there's a reasonable expectation. It does no malice to Section 533 to provide a defense of a malicious prosecution claim. I said it was my last question, but I do have one more, so I lied. Has the California Supreme Court ever addressed this separate issue of duty to advance defense costs as opposed to the duty to defend? It has not. In the context of Section 533, no, Your Honor. But I would suggest that the policy does as well, and I'm not referring to the fraud exclusion. I'm referring to the loss provision. The loss provision excludes from the definition of loss matters that are uninsurable, i.e. Section 533. But it specifically says claim expenses do not apply to those carve-outs. So we will provide claim expenses, which is separately defined to include defense costs. We will provide claim expenses for these conducts, for example, disgorgement, restitution, matters that are uninsurable. And so, therefore, it's not nearly a reasonable expectation that UTA had that it would get a duty to advance defense costs for assuming that these are intentional acts. It's actually a promised grant in the policy that you'd get claim expenses for these types of allegations. So with that slight detour, I do want to make a few points on the professional services exclusion because I think it's also a fairly significant issue here. So as you're jumping into that, could you answer what would fall within the professional services liability, such as simply professional malpractice claims? Yeah, that would be the standard example. So what coverage did UTA have? They had employment discrimination coverage or leasing, breaking a lease or those sorts of things, just sort of general business coverage? I'm sorry, can you rephrase the question? So you have coverage of some sort. You're saying that the professional services exclusion doesn't apply, that that's just limited to essentially some sort of malpractice claim. What did this coverage, what was covered by this policy? Acts, errors, and omissions in the conduct of UTA's business. I mean, it's broad. It's a non-public D&O policy, which provides a broad coverage. So if the UTA bus ran over somebody, you were covered? As long as it's not subject to an exclusion, yes. Yeah, I mean, is that embezzlement? I guess putting aside intentional acts exclusions, it would cover embezzlement and things like that? Putting aside intentional acts, yeah, I can't hypothesize. But in general, any act, error, or omission or any wrongful act they commit would be covered under the broad coverage grant, and then you're carving out for various exclusions or statutory exclusions like Section 533. So your friend in his brief, I think it was this case, said several times that they think UTA has a professional liability policy and that you received indemnity or coverage for this claim. Is that true? I wouldn't go that far with what they said. I think they asked the panel to inquire of me of that, and so my response is twofold. First, it's outside the scope of the record. There is no evidence of any professional liability policy. But I won't dodge the question. Yes, there was a professional liability policy in place. It was exhausted by the payment of certain defense costs, and the fact of the matter is that the scope of the exclusion here is narrower than the coverage grant provided by that policy. So at the end of the day, would they be entitled to a credit against the cost of litigation part of this case for whatever you received under the other one? Yeah, we're not seeking those amounts. And I think the implicit suggestion that is being made by the other side is that there's a jigsaw puzzle here, and it falls in one piece and it doesn't fall in the other, and therefore they should prevail. But I think that's operating under an assumption that multiple policies can't apply to a single claim. But the fact of the matter is that happens all the time, and that's, in fact, why there are other insurance provisions to deal with what happens when you have multiple policies applying to a claim. So I think the fact of professional liability policy in existence is really neither here nor there. The question is, does the alleged conduct fall within the scope of the professional service exclusion? And this might be a very good reason to, if we agreed with your position on professional liability, to send the case back because we don't know whether or not all your defense costs were paid by the other policy. Yeah, there's no factual development of that. I mean, I could represent to the court here that they were not, and that, in fact, some of the... Yeah, well, don't. No, but I did... I say we don't know, and we don't know. That's fair. But I do want to make a point, though, and it's relevant to Section 533, which is that separate and apart from whether or not we think the district court got it right on the interplay of the fraud exclusion with Section 533, the defense costs that are owed would exceed limits here. So it's really a question of whether or not there's indemnity here. It really isn't all that relevant to the disputes between the parties because defense costs really swallow up the vast majority of the limits. And I see that I have limited time, so I'll reserve the rest for rebuttal. Thank you. Mr. Perlis. May it please the Court, I have the honor of representing Markell American Insurance Company in this appeal. First, I wanted to address Section 533 because I think there may be a misapprehension on UTA's part as to how broad the obligation to advance defense costs is. The policy specifically provides that the obligation to advance defense costs solely involves advancing defense costs for covered claims. To the extent the indemnity obligation of the carrier is not covered by virtue of Section 533, there is no obligation to advance defense costs. In Downey Venture, for example, they said that the obligation to advance defense costs was a product of the insuring agreement's statement specifically that malicious prosecution was covered, and if the court had determined that no defense costs were available, it would make the claim hollow. It would be illusory coverage. And on that basis said, all right, you can advance defense costs, but also said that the court would not tolerate under Section 533 a settlement based upon the assertion that the settlement amounted to nothing more than the defense costs that would have been saved by virtue of having made the settlement. But do you agree the district court never addressed this issue? No, it did not. Because it thought the professional liability exclusion applied. Yes. And if we were to disagree with the district court on that, isn't this an issue that ought to be addressed by the district court in the first instance? Well, the district court also found that it wouldn't apply by virtue of the fact that there had to be an adjudication. You see, that's my problem with that. Now we're getting to the 533 issue. 533 doesn't require an adjudication. It does not. The policy provision requires an adjudication, but 533 does not. It's apples and oranges. And one of the reasons it's apples and oranges is that the policy provides coverage worldwide for CAA. There are some jurisdictions, unlike California, let's, for example, say Delaware, that require. No, I understand why the policy provision is there. My question is, if we're dealing solely, and they're not arguing that the policy, the policy provision cuts in their favor. They're arguing 533. You're arguing 533 cuts in your favor. So my question is, does 533 require a final adjudication? No. We've all been talking about Downey and other cases. So wasn't the district court just wrong in its reason? Absolutely. So once again, we could do its work for it, but why don't we just send it back and say, if we don't agree with you on professional liability exclusion, district court, you got it wrong on 533. It doesn't require a final adjudication. You figure out in the first instance whether it applies. The second element of it is that, assume that 533 does not require an adjudication. Based upon the facts alleged in this complaint, what is the impact of 533 on potential liability for the carrier based upon what is asserted? And with respect to that, I would point out that if you read the first few paragraphs of the complaint in the Superior Court, it reads like a criminal indictment, not like a civil complaint. Midnight raids, illegal midnight raids, you can go on and on about it. And even under California law, where negligent conduct or even reckless conduct is inextricably intertwined with conduct prohibited under 533, it's all prohibited under 533, and that's the California Court of Appeals decision in Mintarsi. So you can't escape. But you'd have us decide that in the first instance. I think you're honest. Both of you guys want us to do all the work. I think your honors can decide it in the first instance because it's all there. Sure, I think we can. I guess the question is whether we should. There seem to be a lot of issues that you're both asking us to decide in the first instance that the district court conveniently never got to. Well, if I may, Your Honor, let me turn to the issue of the professional liability exclusion because that's really one of the centerpieces of what's at issue here. And in that connection, I think there is really two problems. One, you've heard, which is there was a professional liability. Well, but I don't care if there was another policy or not. That doesn't tell me anything. It does say this. Maybe they were belt and suspenders, guys. Maybe they worried that you people were going to take an unreasonable position, so they went out and bought an insurance policy. Well, I guess the question is, assuming there were two policies, one of which broadly excluded professional liability. But just put aside the other. You're not going to get very far with me, at least on the other policies. Deal with the language of this policy. This policy has what's captioned a broad professional liability exclusion, unlike Ambrosio, on which UTA relies extensively, which had what was called a partial professional liability exclusion. This policy excludes virtually anything associated with the rendering of professional services. And the question then becomes, is this a situation where what really happened is a bunch of random agents left CAA to go to UTA in the expectation that they'd be able to develop clients that would make them heroes at UTA. And nothing could be further from the truth. Even in the allegations of the complaint, it is clearly stated that this was a plan that had its genesis while these particular individuals were serving in their capacities at CAA. They engaged in the delay of meetings so that when they left CAA to go to UTA, they could close business deals that were brewing at CAA at UTA. Even UTA acknowledges that. That is an issue, something they didn't say in the district court, but acknowledged in their appellatories, which falls directly within the exclusion. Wait a minute. If these individuals were not employees of UTA, how was their coverage for UTA in the first place? Well, that's another issue that we raised is capacity. But they were acting on behalf of UTA, is the allegation, in deferring meetings with CAA clients so that when they ported them over to UTA, they could then close the business and get the revenue. There are all kinds of allegations in the complaint that address professional services, like... Well, but so what's left for your policy, then? What does your policy cover? The policy has EPL coverage. It can handle wrongful termination, sexual harassment. It has... Why aren't those in connection with the provision of professional services? No. For example, let's suppose... I know why they're not, but I guess under your interpretation of... this broad interpretation of professional services, if they were engaging in employment discrimination among people who were providing professional services, why wouldn't that be covered? Well, they're not providing professional services to a client. They're providing services to CAA or UTA. But the allegation here isn't that UTA committed a tort in providing professional services to a client. It's that it stole the clients or stole the agents, I mean, to make it simple, right? They stole over 30 agents and over 200 clients. Okay, fine. Let's assume they stole every single agent and client in the world. My question is, how is that providing of professional services? Because what they're doing is, in one case, which UTA acknowledged in its brief, delaying meetings with people to take them over. But they're not complaining. Nobody's suing them for delaying the meetings. That's exactly what they're doing. No, the clients are not suing them for delaying the meetings. No, it doesn't have to be the clients that are suing. I think it has to deal with whether or not it is directly, indirectly arising out of, et cetera, the broadest you can make it. What's your best California case interpreting this provision that broadly? This court's decision, albeit unpublished in Hot Chalk in 2020. So a Ninth Circuit unpublished decision. Yes. So is this a question that the California Supreme Court should answer? I think that the California Supreme Court could answer it, but doesn't necessarily need to answer it. I think this court can and has in the past answered what constitutes the rendering of professional services. One of the things that I think is pretty obvious in terms of what the complaint alleges is their prayer for relief, where they want an injunction against the people who were departing from rendering professional services to any clients they had at CAA. If that isn't rendering professional services, I don't know what is. They specifically state that. They want disgorgement of the compensation paid to certain of the individuals for the disloyal period when they were really working for UTA while at CAA. They allege that while still employees of CAA... That would be a claim on behalf of CAA, and CAA is not the person covering their disposal. No, CAA is claiming it against UTA. Right. And so the question is, what does it mean? That has to do with the CAA's business, not UTA's business. It does have to do with CAA. The complaint's about, you're taking my agents, you're taking my clients. That's right. And you're making money off my clients. And so those are not in connection with the rendering of professional services by UTA. When I reach in your pocket and steal your wallet, is that malpractice? No, I don't believe so. Well, what's the difference between that and... Because what it says is really that while they were purportedly rendering professional services for CAA, they were actually rendering professional services for UTA and collecting money from CAA, which they have to give back because they were really earning the money for UTA. It's a breach of the duty of loyalty. No, the duty of loyalty to whom? They had no duty of loyalty to CAA. Yes, that's the allegation. They had a duty of loyalty to CAA because they were employees... Well, how can they have a duty of loyalty to CAA? Their client is, you know, is the talent. Their argument about duty of loyalty to CAA is that they were employees of CAA and they were under employment agreement, some of them, to CAA. I guess we're talking about a different day. Does UTA have a duty of loyalty to CAA? Does UTA... I guess that's a factual issue. It's hard for me to see how one agency would have a duty of loyalty to another agency. The agents might have a duty of loyalty. And still be competitive and not violate the anti-trust laws. Well, let me, if I could, read to you the first prayer for relief. This is the CAA complaint against UTA. For a temporary restraining order and a preliminary and permanent injunction against defendants, prohibiting defendants and those acting in concert with them from soliciting or providing services to any clients who were also serviced by these individuals while they were employed at CAA. That's a fancy way of saying you're stealing my clients. That is an injunction saying they were rendering professional services at CAA and we want you enjoined from rendering professional services to these people. But you're talking about the individuals, right? It's everybody. The defendants and those acting in concert. But why does C... UTA certainly didn't have any duty to CAA. It may have been that these individuals breached their duty and it may have been that they did so at a time when they were employed by UTA. But wouldn't you concede that the corporation didn't have any duty of loyalty to its competitors? Well, they had a duty not to interfere with contracts, which is one of the allegations against CAA. They had a duty not to interfere with prospective business advantage, which is something that was alleged with respect to UTA's obligation to CAA. Those were certainly duties. CAA had a duty not to interfere with their contracts with CAA. You can go on and on on this. Those were specific duties that UTA had to CAA. And are they covered by 533? Some of them are, yeah. Some of them are not, though. As I said, because of Mentarsi and the way you look at the first several paragraphs of the complaint, there is no way this was accidental, negligent, even reckless. This was all intentional. They call it a midnight raid, I think. And they call it illegal, the whole process. It says, this case is about a... This is the first paragraph of the complaint. This case is about a lawless midnight raid that UTA and its co-conspirators launched against CAA in a desperate attempt to steal clients and employees. Months in the making, this illegal and unethical conspiracy has resulted in a number of agents who were under contract to CAA to brazenly and abruptly breach their contractual obligations to CAA and to intentionally and deliberately interfere with CAA's existing and prospective economic relationships with its clients. In the process, UTA and its co-conspirators have tortiously inflicted economic damage. Your case is that those acts were done in the course of UTA's rendering of professional services. It was done in the course of UTA's rendering and in the course of CAA, these people's removing CAA clients to UTA, which benefited UTA economically. Doesn't he embrace that? I'm sorry, go ahead. The last half of those allegations have nothing to do with whether or not UTA is rendering professional services while it was engaged in stealing CAA's clients. Well, UTA, for example, one of the allegations is that UTA induced some of these CAA then employees for, while they were still CAA employees, trying to get clients to sign over contractual obligations to UTA. Now, getting a competitor's agents to work for you to steal the other person's clients, those are rendering professional services? I think that it is the process of rendering professional services, yes. You are taking clients... Doesn't Ambrosio that you rely on cut exactly the other way? I don't rely on Ambrosio, they do. Okay, so what's your best case? Didn't you say Ambrosio? I'm sorry. I'm sorry. You said, I was confusing our non-binding mem disks. I got you. Thank you. You're welcome. And I thank you. I see I've run over. Thank you. Unless anybody has any more questions. Thank you, Mr. Perry. Thank you. All right. Mr. Garrett, you have a couple minutes. Within those two minutes, I think I'll try to address two points that were made. One is that, and this is really the only response to the fact that Section 533 does not apply to the duty to advance defense costs. And the response is, well, if there's no indemnity possible, then we don't have any obligation to provide defense costs, to advance defense costs. And that's simply not true. That is a general statement, for example, from BUS in the California Supreme Court involving... What does this policy say? Yeah, the policy says something different, right? It promises to pay loss on account of a claim and defines loss to include claim expenses and then further defines that as defense costs. And the California Court of Appeals... For a covered conduct, right? No, it just has to be loss on account of a claim alleging a wrongful act. If an exclusion applies, that's completely separate. And this is the Southern California pizza case that we cite in our brief, the California Court of Appeals, where it said that when defense costs are included in the definition of loss, they necessarily are amounts paid on account of a claim. And whether the relief sought in the underlying litigation, quote, are covered losses is neither here nor there. Defense costs are a separate component of loss. We have suffered that loss, and we're entitled to recover them, and Section 533 presents no bar to that. Markell indicated that Hotshock was its best case. That case involved an underlying claim where the insured violated federal regulations considering the enrollment of students. The insured conceded that its professional services included those student recruitment services. And this court held that those services caused ineligible students to submit claims for federal and financial aid. So the liability there flowed directly from the professional services that were being rendered, and therefore fell within the ambit of the exclusion. Here, that's not the case. The conduct that is being done, the solicitation of employees and clients, it's not in connection with the rendering of professional services, and has nothing to do with rendering of professional services, that limited grant there. So on that, I would submit that the professional services exclusion does not apply, and Section 533 is not a complete bar to coverage. Thank you. Thank you. Thank you, counsel, for your arguments this afternoon. This case is submitted. Excuse me, Your Honor. Do I get it? I'm a cross appellate. But you're really not, since you prevailed below. You can't. I'm a 533. No, you're dead. I mean, as a matter of federal civil procedure, you're not a, you prevail. You can't cross appeal from a judgment in your favor. Well, there's no harm in asking. All right. Thank you. All rise. This court for this session stands adjourned.
judges: TASHIMA, HURWITZ, BADE